This next case is 410-0790, appearance Jackson v. Randle et al, appearance for the appellant of Clinton Crislow. You are he, sir? Mr. DeWitt. Mr. DeWitt, you'll be doing it? Okay. And Mr. Leitner on behalf of Appalooh. Mr. DeWitt, you may proceed, sir. May it please the court. Good morning, your honors. My name is Robert DeWitt for Romeo Jackson and the Puget Clap. This is a simple case about Department of Corrections officials overcharging inmates for commissary codes in excess of their authority under Section 372A of the Unified Code of Corrections. There are two main issues before the court today, both stemming from the circuit court's dismissal of our claims. First is whether an inmate can enforce Section 372A of the Unified Code. The second is whether sovereign immunity bars any of our non-objective relief claims. On whether an inmate can enforce Section 372A, the court erred in holding that inmates lack standing to enforce Section 372A and therefore can't sue for any relief. First reason for this is that there is nothing in the clear language of the statute that limits any of the available remedies. And perhaps now equally important, there's the decisions from both this court and Hadley v. Department of Corrections and the Illinois Supreme Court in Hawkins that we submitted, I think, last week to the court that I think defeat the argument that inmates cannot enforce sections of the Unified Code, especially in this case, Section 372A, which is clear. You seem to be putting great weight on the Hadley decision. I think it has the same sort of subject matter and it deals with a clear non-discretionary section of the Unified Code. Well, as you point out, the state here, the state at trial, trial court, all gave great weight to the decision of this court, Ashley v. Snyder, and it's your contention that Hadley in effect implicitly overrules it? I think that probably the accurate way of portraying it is that Hadley is applicable to this case and Ashley is applicable to constitutional liberty interests. And I think that's the central focus of Ashley, is that in that case, the issue was about liberty interests and the inmate had brought a claim. Well, I didn't make up this characterization. Your reply brief says Ashley v. Snyder has been implicitly overruled by Hadley. Yes, I remember that. I modified it a little bit. Well, the reason I raise this question is when did you reach that theory? Did you argue that to the trial court? Hadley?  I don't recall offhand, Your Honor. You didn't argue it in your initial brief either. This is only a reply brief. Well, I believe Hadley is cited in our initial brief. It's cited, but there's no claim. I mean, it's just cited for the point about the question of standing generally, but there's no argument in your brief that what you were saying, your reply brief, Ashley v. Snyder has been implicitly overruled by Hadley versus the Department of Corrections. I'm just curious about this because Ashley, rightly or wrongly, is a case primarily relied upon by the state, cited by the court, and it's ruling. You say that was wrong, and it's only until the reply brief that you come up with the theory that, by the way, Ashley's been overruled. How about that? I don't think it was intentional, Your Honor. I think that it became obvious to us at that time. Well, you know, one of the – you're looking at a panel here, and I haven't told it up exactly, but I think we probably have about close to 40 years, maybe in excess, of cumulative experience as a trial judge. Now that we're on the appellate court, one of the important concepts that I feel, and I think most appellate courts feel, judges feel, is that we're not going to reverse the trial court based upon an argument the court never heard. This key part of your reply brief, Ashley ain't no good no more no how because Hadley overruled it, doesn't appear to have been made in the trial court, and indeed doesn't appear to have been made until a very recent analysis by you, not in time even to make the initial brief in this case. If Your Honor wishes, I can ignore Hadley for the remainder of the time. Well, I'm just – you know, I don't want to be suggesting something here in blindside of you. This is a concern of mine. Okay. Any thoughts on that? I think this court should consider Hadley in any event because it's a subsequent decision of this appellate court. Okay, go ahead. Okay. Kind of as I was beginning with regard to Ashley, reading Ashley, it's a case about liberty interests, and that was the focus of the limitation in Ashley to prevent inmates to – from bringing these sort of odd claims that they have liberty interests in. And I think in that case, it was some amount of property in their cell. And the difference between a case like ours and a case like Ashley is that for liberty interests, you have to have procedural due process and a deprivation hearing in order to take that away from an inmate. In this case, it's not an issue. I think also, you know, Ashley doesn't discuss standing at all, and Ashley's concern of an inmate combing through regulations is not really prominent in this case. Is the defendant's case in this litigation premised upon the Unified Code of Corrections? The defendant's case? No, plaintiff's. Oh, yes it is. It is based on a statute of the Unified Code of Corrections, yes. So we'd have to either overrule Ashley or mitigate it in some fashion to permit this case to go forward? I think you may have to address Ashley, yes, Your Honor. How should we address it? In addition to the liberty interest distinction that I made, I think the other important point is that Ashley, as I said, was concerned about inmates combing through regulations. Here you've got an Auditor General's report that was an official report of the state required by the specific statute. Oh, in addition, Ashley didn't have any kind of analysis of a specific Unified Code statute, and to the extent that it addressed it at all, it just said that the statute was irrelevant to the inmate's injury. So I think those are my main points on Ashley. Now with respect to sovereign immunity, the Court erred in dismissing our non-injunctive relief claims on sovereign immunity grounds. Now, I just want to make note that the Circuit Court ruled that sovereign immunity does not bar injunctive relief claims. With respect to the other claims, the first question for sovereign immunity is whether this is a case against the state, and there's decades of Illinois Supreme Court precedent that says where state officials act in excess of their authority or in violation of statutory law, it's not a case against the state and sovereign immunity does not apply. Those cases include Senn Park in 1984, Healy in 1990, Loyola in 1997, PHL v. Pullman in 2010, and it's also stated with respect to acting in excess of authority in a state building venture v. O'Donnell in 2010. I would also make note, though we've discussed Hadley, that in Hadley it stated that an exception applies for cases like this where a statute does not involve any discretion, and this is a clear statute that has a clear limitation on the Department of Correction's statutory authority. You're saying that Hawkins is authority for your position in this case, the new decision from the Supreme Court? I think Hawkins has relevance to whether an inmate can invoke the protections of the Unified Code. Well, that was invoking them arguably in response to a suit brought by the Department of Corrections. That's true. As opposed to using them as a vehicle to make a claim in this case, as it happened in this case, is that right? It is somewhat different in that way, but I think the Supreme Court's allowing Hawkins to assert that statute in his favor indicates that inmates can invoke the protections of the Unified Code. It's not limited just to administrative guidance. Further, with respect to enforcing one of these provisions, in particular the provision in this case, I think it's important for the Court to focus precisely on the language of 372A. The Court below did not apply a standing test or an implied prior right of action test, and as we discussed in our briefs, inmates meet both those tests. I think it's important, too, to point out that the relief we seek is not necessarily in violation of 372A. The relief we seek is sort of three steps. First, a declaration that the Department of Corrections has violated section 372A. And second, to enjoin and stop that practice, in particular that the state officials have violated that statute. And then, subsequent to that, correct any accounts for the inmates. How much money is at issue in this case? The amounts the auditor general identified are in excess of $7 million, but we're not asking for money. We're just asking for a correction of inmates' accounts. Thank you, Counsel. Mr. Wagner? Good afternoon, Your Honors. May it please the Court. Counsel? My name is Brett Wagner. I'm an assistant attorney general, and I represent defendant affiliates in this matter. Your Honors, this Court should affirm the judgment of the Circuit Court dismissing plaintiff's claim on two grounds. First, all of plaintiff's claims are barred under this Court's decision in Ashley v. Snyder. And second, plaintiff's counts 1, 3, 4, and 5 are barred under the Doctrine of Sovereign Immunity. So those claims are without the jurisdiction of the Circuit Court. Turning first to the Ashley decision, Your Honors, this Court in Ashley, relying on the U.S. Supreme Court's decision in Sandin v. Conner, made it very clear that the Code of Corrections and the Department's regulations are not intended to confer rights that are other than those that are otherwise protected by the Constitution. The Code of Corrections creates no enforceable rights that otherwise would not exist absent a constitutional predicate. If there's no constitutional predicate, there are no enforceable rights under the Code of Corrections. That was relying on, this Court relied on, the Sandin rationale that otherwise inmates combed through Codes of Corrections and prison regulations seeking to find new rights, statutory or otherwise, and enforce them against the state. The problem with that was that it created a disinclination for states or prison authorities to codify the regulations, and it also interfered with the orderly administration of prisons. Recognizing that, this Court in Ashley made very certain that the Code of Corrections provides no rights, either constitutional or otherwise. Ashley was not limited to constitutional rights. It used the disjunctive. It said no enforceable rights. Well, there was, 11 years ago, Ashley relied on Sandin. Has there been any change in U.S. Supreme Court doctrine that would suggest another mining of the rationale in Ashley, or for that matter, other courts of this state? We don't believe so, Your Honor. The Sandin rule still applies in full, and Sandin did away with the methodology that had been applied up to that point in U.S. Supreme Court cases, as emblemized by Hewitt v. Holmes, for instance, in which courts would look at Codes of Corrections and say, well, this provides a right, therefore it may be enforced against prison. Sandin did away with that. That is still the rule. Hawkins, for instance, or the Illinois Supreme Court's recent decision in Hawkins, cited by plaintiffs as supplemental authority, does not change that analysis. Hawkins did not involve an inmate action to enforce any rights against the department. Hawkins did not presume that inmates could bring an action to enforce any rights under the Code of Corrections against the department. Hawkins involved an action brought by the Department of Corrections against an inmate to seek to recover or to seek to levy against some assets held outside of the prison system in a separate bank account, not even in the prisoner's trust account. And the court said, that goes too far. That exceeds the department's authority, the department being a creature of statute. That exceeds the department's authority. Nowhere in Hawkins did the court purport to confer upon any inmates any rights enforceable in an action. Now, let me ask you, as you heard, I mentioned to Mr. DeWitt about the Hadley case. One of the problems with raising something in the reply brief is, of course, for the first time, this theory is you haven't had an opportunity to address it. Correct, Your Honor. Am I correct that this was an argument also not raised at the trial level? That is correct, Your Honor. Their opposition to our motion to dismiss did not raise the implicit overruling argument. Well, nonetheless, it remains within our discretion whether we entertain the argument or not. You're a sharp, experienced advocate, Mr. Leibniz, and I suspect you might have some thoughts about it. And since this is your only opportunity to convey them to us, there being no surrebuttal briefs, do you have any position about the argument that Hadley implicitly overrules Ashley? It just so happens that I do, Your Honor. Okay. So in addition to the obvious Supreme Court Rule 341H7 forfeiture issue, plaintiffs make no mention of the fact that the Hadley decision from this court that they cite went up to the Illinois Supreme Court. There's a subsequent case in which the Illinois Supreme Court, while certainly affirming this court's Hadley decision, didn't use the same language necessarily. So the reliance on certain language from this court's Hadley decision certainly is dubious at best, especially given their complete silence with regard to the subsequent Supreme Court decision. Now, what's interesting is the brief from the plaintiff doesn't make reference to the later Supreme Court decision in Hadley. Correct. What did the Supreme Court say in Hadley's decision? The Supreme Court affirmed the appellate court and found that, and this is a case concerning the $2 copay and whether somebody qualifies as indigent, the court found that the department's regulations defining when somebody is indigent conflicted with the code of corrections. The court did not include any broad language finding an enforceable right on behalf of an inmate in that case. Moreover, and I think this is another important point, in Hadley neither this court nor the Supreme Court addressed the issue of the enforceability of code of corrections provisions. Ashley was not raised, Ashley was not discussed by the parties or the court. Ashley wasn't discussed in Hadley at the Fourth District level either. That's correct. Ashley wasn't discussed and the briefs didn't raise the Ashley decision in that case. Is there anything in Hadley that you believe should give us pause about any aspect of the earlier Ashley decision? No, Your Honor. And the reason for that, there's a couple. First, as far back as 1950, and even further back, the courts have recognized a cogent policy against overruling cases by implication. And it should only be done where a serious detriment prejudicial to the public interest would occur. And I'm quoting a case called Anderson v. Brown, 340 Illinois Appellate Court, 613 at 622. That's the Second District case of 1950 that Justice Harrison cited in a subsequent special concurrence in 2002. In any case, in addition to not addressing the issue, Hadley, and again it wasn't even raised, in Hadley there was a constitutional predicate to the rights that were argued. Perhaps this is why the Ashley point was not raised. Hadley concerned medical care and rights to medical care. And there are constitutional predicates to the right to medical care. Weren't some of those discussed in Ashley? Some of those were. The right to medical care? The right to medical care and subsequently in the McNeil decision. And the court went broadly in McNeil and found that the Unified Court of Corrections confers no private right of action to sue for inadequate medical care. Nonetheless, insofar as this court could say that Hadley, in addition to not even addressing the Ashley analysis, or the Ashley point, could be founded on a constitutional predicate that could make them reconcilable. Additionally, I would add, in 2009, this court in Bilski v. Walker, cited by defendants in our brief, in 2009, quoted Ashley for the proposition that the Illinois law creates no more inmate rights than the Constitution. And so far as Hadley could be concerned to implicitly overrule Ashley, well then Bilski implicitly overruled Hadley. It's a case of resurrection? It's a case of resurrection, Your Honor, exactly. So it's an implicit judicial resurrection of the Ashley decision from Bilski. And Bilski is at 392, Illab, 3rd, 153, and it's at 157 where this court wrote, we also stated that Illinois law creates no more rights for inmates than those which are constitutionally required, citing Ashley. So certainly, as of 2009, years after the Hadley analysis, years after that purported implicit overruling, this court still abided by the Ashley ruling. That certainly casts doubt on the notion of any implicit overruling, not to mention the fact that it was forfeited and implicit overrules are certainly disfavored in any case. Does a commissary sometimes provide items that are necessary for constitutional rights, constitutionally required, like medical or food or sanitation or whatever? All items that inmates are constitutionally entitled to are provided to them. They don't have to necessarily go through the commissary. So if the inmate had jock rash or something like that, and he wanted to get some powder or whatever, that he could only get at the commissary, that would be provided to him by the prison? If it was a sufficiently serious medical need. Sufficiently serious. We have Eighth Amendment, for instance, limitations as the constitutional predicate for providing medical care such that you can't be delivered, that prison administrators cannot be delivered, anything different to a serious medical need. But jock rash wouldn't be a serious medical need? McNeil holds that the Code of Procedures provides no private right of action for inadequate medical care. So insofar as there was an issue there, the holding of that case would indicate that there's no enforceable right to get powder from a commissary. And the courts, federal courts especially, have been uniform in holding that there's no right to commissary privileges. You have no commissary right. The department, for instance, has to provide inmates with soap, basic hygiene. Better soap may be available at the commissary. The department has to, as far as inmates can't afford soap, the department has to provide them soap. That's not a commissary issue. The department has to make that available. So the department could close the commissary if it wanted? Yes, absolutely. And under 3-7-2A, it specifically says if the department chooses to operate a commissary. The department doesn't have to operate a commissary. The department does not need to maintain a commissary. And that's one of the purposes of 3-7-2A. That's why it's an Administrative Guidance Statute. That's why it's an Administrative Guidance Statute. That statute makes it clear. That statute tells prison administrators that they, A, do not have to even maintain a commissary. B, the kind of things they can build into the cost of the goods as well as the additional charges. C, how to handle commissaries when they're maintained for their staff. D, what to do in terms of pricing or accounting when collective bargaining agreements require accounting adjustments. All that's set forth for the benefit of prison administrators in 3-7-2A. It's not a prisoner protection statute. They have no right. That provision itself doesn't give inmates a right to a commissary. It's up to the department. It leaves it to the discretion of the department as to whether they're going to provide a commissary. The department certainly has constitutional obligations to feed inmates. And they do. They provide their meal. And provide them with basic hygiene. Soap, things like that. And they do. You don't get those basic constitutional requirements through the commissary.  But the department could not defend on the basis that those items were available through the commissary. Right. The department would defend on the basis that there was no constitutional entitlement to the powder. Because an inmate has only constitutional rights to raise. And the department would raise under the Eighth Amendment analysis the argument that there was not a serious medical need requiring it. And that's where the focus would be, again, on the constitutional predicate. Turning to sovereign immunity, Your Honors. This is clearly an action against the state that would subject the state to liability. The plaintiffs are sued in their official capacities. The plaintiffs seek by their action to control the state's actions. They seek to require the state to alter accounting practices. To alter commissary pricing practices. And they seek to subject the state to liability. In paragraph 64 of the complaint, plaintiffs specifically allege that defendants have injured the plaintiff class in the amount of $7.026696 million for three fiscal years. They're raising a present claim of monetary damages. In their perforated wreath, D, they seek judgment for plaintiff for compensatory damages. This complaint clearly seeks, no matter how they try, the plaintiffs claim that defense continually mischaracterizes the complaint, but we're quoting the complaint. The complaint seeks damages against the department for present claims. And that is barred by sovereign immunity. All those claims additionally are founded upon state law. As you know, the Court of Claims Act requires that any claims against the state founded upon any law of the state are within the exclusive jurisdiction of the Court of Claims. Counts 1, 3, 4, and 5 are all based on state laws. They're based on the Code of Corrections, or one count is based on the Consumer Fraud Act, but that itself is based on a violation of the Code of Corrections. So everything reduces back to a purported violation of state law. All those claims, thus, are within the Court of Claims' exclusive jurisdiction. Plaintiffs argue that they can bring a suit when claiming that state actors have acted illegally and requiring them to enforce the law correctly. Insofar as they are seeking to invoke the state actor exception to sovereign immunity, such that they can seek an injunction requiring the state to comply with the law, that's fine. But that's not all they're doing. Simply claiming that, and there are other claims. There are other claims focused on the fact that the department has in past violated state law by these alleged overcharges. That does not take this case out of sovereign unity. The Court of Claims Act presupposes a claim that the state has violated state law. Because it says, any claim against the state founded upon a state law. The question is, well one of the questions is, and this is from the Fritz case, the question is whether the claim against the defendants or against the state arises from a statute that applies by virtue only of their state employment. And that's true here. Any duty or any statutory duty that is implicated by this case arises only by the Uniform Code of Corrections. The Uniform Code of Corrections applies only to state employees, prison administrators. In the reply brief, plaintiffs sought to distinguish Fritz on the ground that, while Fritz concerned a source of duty analysis for a tort claim, that did not involve a source of duty analysis for a statutory claim. But in reaching its rule, Fritz looked at both Healy and Ellis. Healy and Ellis both involved statutory claims. And as such, the Fritz rule logically and clearly applies the source of duty analysis not only to tort claims, but also to statutory claims. Thus wrapping up the sovereignty and immunity aspect, your honors, plaintiffs claim in Accounts 1, 3, 4, and 5 would subject the state to liability, would control the state's actions, and seeks to achieve damages against the state. Even if the court would use a euphemism and say that this concerns crediting inmate accounts, it still involves the transfer of department funds that are not appropriated for this to inmate accounts. That's the same effect of a monetary judgment. Finally, wrapping up and turning it back to Ashley, this court's decision in Ashley was clear. The court's rationale and explanation in Ashley was not limited only to cases where liberty interests are raised, as this court means. And it wouldn't make any sense. The concern in Sanden and the concern in Ashley was that inmates comb through these regulations and interfere with the administration of prisons by raising claims, and create a disinclination into codifying prison management regulations. That applies equally to whether they're raising a constitutional claim or a statutory claim. The point is that they're raising claims funded on rights, be they statutory or constitutional, that they think that they can enforce. That's what Sanden sought to avoid, and that's what this court sought to avoid, with its explanation in Ashley adopting the Sanden analysis. Your honors, if there are no other questions for these reasons, we ask that you affirm the judgment of the Circuit Court. Thank you, counsel. Thank you very much. Okay, Mr. DeWitt, any rebuttals, sir? Yes, your honor. Okay. On the initial standing points, if the court doesn't agree with us that Hadley overrules Ashley, the two can be harmonized, and I think the nature of the relief and the nature of the claim in those cases is important. Ashley is about the deprivation of liberty interests. It has an offhand comment about the unified code. Hadley is more applicable to that because in the case in Hadley, the statute at issue does not grant any discretion. It's not about a broad grant of authority. It's a very specific requirement on the state. Quick note on McNeil. McNeil looked at the particular statute, and that statute gave a broad grant of discretion, not a broad grant of authority. In terms of the point about whether the department officials even have to run a commissary, they are running a commissary, and since they are, there's a statutory limitation that they cannot mark up. Commissary goes beyond 25%. What about Mr. Legner's point that Ashley was cited approvingly discussed by this court four years after Hadley? The Bilski case is about constitutional liberty interests as well. So that's the distinction you draw? Yes. Ashley applies to constitutional liberty interests. Now, with respect to sovereign immunity, the state can't claim interference with its functions when the claim is to force them to comply with their own law. Now, with respect to the Court of Claims Act applying to claims that are just under state law, I think the key distinction in those cases is that where the statute involves a broad grant of authority, those cases are often negligence actions or claiming that the official should have applied their authority in a different way. Those cases end up in the Court of Claims. Cases where it's a clear statutory rule that does not grant any authority to the state, those cases are not barred by sovereign immunity. Finally, again, with respect to the requested relief, we're asking for equitable relief, a declaration that the Department of Corrections procedures and practices are in violation of Section 372A. So a ruling in your favor will lead to a $7 million judgment against the DOC? No, it will require them to credit a full ruling in our favor for all three of the things we've discussed would require the Department of Corrections to correct the accounts in whatever manner they would normally do if they discovered their own error. $7 million. Depending on what we determine from the Auditor General's report. Thank you, Your Honor. Thank you, counsel. I'll take this matter under advisory at recess for two minutes.